## WHITE *vs.* COLE & THURMAN.

Where a *schooner* was mortgaged for a *precedent debt* whilst out on a voyage from Oswego on *Lake Ontario* to Cleaveland on *Lake Erie,* and delivery of the property was not made until after a levy of an execution against the mortgagor in favor of a third person, IT WAS HELD, that as against a purchaser under the execution, the mortgage was *void* within the meaning of the 5th § of the act relative to fraudulent conveyances ; that although the absence of the vessel from *port* at the time of the execution of the mortgage was a sufficient excuse for not changing the possession, such excuse ceased when the vessel returned to port and possession was not forthwith taken by the mortgagee.*

*The exceptions to § 5, specified in § 7 of the same act, to wit, contracts of *bottomry* or [ *117 ] *respondentia,* and assignments or *hypothecations* of vessels or goods *at sea* or in *foreign ports,* refer to loans made or moneys borrowed in reference to a particular voyage or

* *Sed vid. Smith & Hoe* v. *Acker,* 23 *Wendell,* 653.

voyages, are of a nautical character, and do not apply to mortgages of personal propert in their ordinary sense.

The general doctrine of this court in reference to personal mortgages vindicated.

A purchaser at a sheriff's sale of personal property incumbered by a mortgage, will be deemed to purchase only the *equity of redemption*, where the mortgage is a *valid instrument* and the purchaser has notice of its existence ; but not so where the mortgage is *fraudulent*, and the purchase is made *adverse* to the claim of the mortgagee.

*It seems*, a mortgage of personal property is *not a pledge* within the meaning of the statute, (2 *R. S.* 290, § 20, 2d. ed.) authorizing the sale of the interest of the *pledgor*. A pledge as applied to chattels is a *bailment*, that is, an actual delivery of the thing for the security of some engagement. After the title of the mortgagee has become absolute, the statute cannot divest it, and the property is not the subject of execution.

A mortgagor of personal property is an incompetent witness for the mortgagee in a controversy between the latter and a purchaser under an execution issued *subsequent* to the execution of the mortgage, where such instrument is *void* for want of possession of the goods accompanying its delivery, and *actual possession* is not taken by the mortgagee until after *levy* by virtue of the execution.

THIS was an action of *trover*, tried at the Oswego circuit in December, 1838, before the Hon. PHILO GRIDLEY, one of the circuit judges.

The suit was brought for an undivided half of a schooner called the *Deming*, her tackle, apparel and furniture, purchased by the plaintiff on the 9th March, 1838, at a sheriff's sale, by virtue of an execution issued on a judgment in favor of the Commercial Bank of Oswego against *Frederick W. Deming, Chester Deming*, Charles Smyth and John A. Smith, docketed 16th October, 1837, for the sum of $149,77. The execution was tested on the day of docketing of the judgment, was returnable 28th October, 1837, and was delivered to *Francis Rood*, a deputy of the sheriff of Oswego, on the 19th October, who two days thereafter made a levy upon the schooner, by going on board of her, where he found no one, but within three days thereafter informed one of the defendants in the execution of the levy made by him. The Demings at that time had the possession of the vessel, [ *118 ] and continued in possession until December ; they *resided at Oswego*, and were or had been the owners of the one half of the schooner, and Messrs. *Williams & Hollister* of *Utica* of the other half. The vessel was registered at *Oswego* on the 7th August, 1837, in the names of the owners, and was sailed by John Ripson as master, from the time of her registry until she was laid up in December. Before the vessel commenced running, it was agreed between the owners that the *Demings* should run her throughout the season for the joint account of all the owners. At the time of the sale by Rood, an *agent* of Alsop Weed, Jared S. Weed and Richardson Thurman, the latter persons residing at *Troy*, gave public notice that Messrs. Weed and Thurman were in possession of the one half of the schooner by virtue of a mortgage of the same executed to them by the two Demings. After the property was put up for sale, the present plaintiff

inquired if it was one half that was to be sold ? to which *Rood* answered, that he sold the right, title and interest of the *Demings* only, that he would not guarantee that they had any title, and that the purchasers might fight it out. The vessel was struck off to the present plaintiff at *three dollars,* which was the highest sum bid. The value of the vessel was estimated by the witnesses at from $4000 to $6000. The plaintiff rested.

The defendants proved that on 25th August, 1837, the Messrs Demings executed a *mortgage* of an undivided half of the schooner in question to Messrs. Weed and Thurman, conditioned for the payment of $2000, on the first day of September then next, and authorizing the mortgagees in case they deemed themselves insecure to take possession of the vessel previous to the day of payment and to sell her, applying the proceeds to the payment of the debt. The mortgage was filed in the town clerk's office of Oswego on the 28th August, 1837. The plaintiff admitted that the Messrs. *Demings* were indebted to the mortgagees in the sum specified in the mortgage at the date thereof, and that the mortgage was executed to them at their solicitation, and it was proved that at the date of the mortgage the vessel was not at *Oswego,* having sailed from there on the 10th August for Cleave-land, and not having returned to Oswego *until the 2d September ;   [ *119 ] between which day and 24th December she performed four other voyages when she was laid up for the winter. The defendants also proved that on the 28th December, 1837, the Messrs. Demings executed a bond and warrant of attorney to the Messrs. Weed and Thurman conditioned for the payment of $1966,90, by virtue of which, judgment was entered on the 30th December. The bond and warrant were executed as additional security for the debt specified in the mortgage, and it was agreed between the parties that the mortgage should continue in force. On the judgment thus entered an execution was issued and delivered to *Cole,* a deputy sheriff of Oswego, (one of the defendants in this cause) on the 30th December, 1837, and on the 28th March, 1838, he sold the vessel at public vendue by virtue of the execution *and* the mortgage executed to Messrs. Weed and Thurman, the latter being the purchasers at the sale, and *Thurman,* one of the defendants in this case, having indemnified the sheriff. The defendants also proved that on the 28th December, 1837, a *formal delivery* of the schooner, her tackle, apparel and furniture, was made by the Messrs. *Demings* to Messrs. Weed and Thurman *under the mortgage,* and she was placed by them in the charge of an agent. Evidence was given for the purpose of showing that a levy was not in fact made by Rood under the execution in favor of the Commercial Bank previous to the return day thereof. *Frederick W. Deming* was offered as a witness on the part of the defendants, he was objected to as incompetent on the ground of *interest,* and the objection was sustained by the judge.

The evidence being closed, the counsel for the defendants insisted, 1. That the vessel not being in *port* at the time of the execution of the mortgage, this case is *within the exceptions* to § 5, as specified in § 7 of the title to the statutes respecting fradulent conveyances ; 2. That the plaintiff having notice of the mortgage, purchased merely the *right* of the *Demings*, and of course purchased subject to the mortgage ; 3. That the mortgage having been made for an adequate consideration, in good faith, and without any intent *to defraud, was a valid conveyance, and entitled to a preference over the judgment of the Commercial Bank ; 4. That the question of *fraudulent intent* was a question for the *jury* and not for the court ; 5. That the circumstances of the case—the property mortgaged being undivided ; arrangements having been made for running the vessel throughout the season, with which the mortgages could not interfere ; and the distance of their residence from Oswego, were sufficient reasons to account for possession not accompanying the conveyance ; 6. That there was no legal *levy* under the execution of the Commercial Bank, and that this question should be submitted to the jury ; and 7. That the *nominal* sum of *three dollars* was not a sufficient consideration to support the sale, and that the question should be submitted to the jury, whether, under the circumstances of the case, the sale was not fraudulent. The circuit judge thereupon delivered his *opinion :* that the case did not fall within the exceptions specified in the 7th § of the act concerning fraudulent conveyances ; that the plaintiff, under his purchase, took all the interest of the Demings in the vessel which the plaintiffs in the execution had a right to sell ; that under the rule adopted by the supreme court it was not enough to show a good consideration for the mortgage, but that a good reason for not delivering possession must be shewn, and that though the fraudulent intent is a question of fact, yet the reason for not delivering the possession of the property, though it consists of facts, must, on the authority of several cases, be facts which by the rules of law afford good reason for such non-delivery ; and that in his opinion the facts shewn in this case did not upon those authorities furnish any such good reason for the non-delivery, not only before the forfeiture of the mortgage, but for a long time thereafter, even until the close of the season ; that a creditor or purchaser looking at the morgage on file, and seeing the time elapsed for the fulfilment of the condition and observing the property still in the possession and use of the *Demings*, might justly conclude that the debt was paid ; that possession might have been taken by the agent of the defendants, at any time after the forfeiture when *the vessel was in port ; that the smallness of the sum bid by the plaintiff did not affect the validity of the sale, the agent of the defendants being present at the sale ; that the *levy* was valid if made in the manner testified to by the deputy, but the facts in reference to the levy would be submitted

to the jury, and that the only questions for the jury were whether a proper levy had been made, and if they should find in the affirmative, then as to the amount of damages to be awarded to the plaintiff. After the counsel for the parties had addressed the jury upon the questions designated by the judge to be submitted to them, the judge charged the jury, who found a verdict for the plaintiff for $1750. The defendants, on a *case* made, asked for a new trial.

*S. Stevens*, for the defendants.

*W. F. Allen*, for the plaintiff.

*By the Court*, Cowen, J. The statute under which the plaintiff claims title, 2 *R. S.* 70, 2*d ed.* § 5, declares, among other things, that every assign- ment of goods and chattels by way of mortgage or security, or upon any condition whatever, unless the same be accompanied with an immediate de- livery, and be followed by an actual and continued change of possession of the things mortgaged or assigned, shall be presumed to be fraudulent and void, as against the creditors of the person making such assignment, or sub- sequent purchasers in good faith ; and shall be conclusive evidence of fraud unless it shall be made to appear on the part of the persons claiming under such assignment, that the same was made in good faith, and without any in- tent to defraud such creditors or purchasers. Subsequent sections 9 and 10, *id.* 71, declare such a mortgage absolutely void without any qualification, unless it be filed in the clerk's office of the town where the mortgagor re- sides. In the case at bar, the mortgage being filed, must stand or fall by the 5th section, unless it come within the 7th, *id.* 70, concerning bottomry and respondentia, and assignments and hypothecations of vessels at sea, or in foreign ports.

*Taking the case upon the 5th section, it comes to us with a [ *122 ] shade of difference from those which have heretofore been presen- ted for our consideration. Is this a mere difference of fact or principle ? The vessel being, at the time when the mortgage was executed, abroad on her trip to Cleaveland, an immediate delivery was impracticable, and this doubtless furnished a legal excuse for postponing the time. The statute re- quired the immediate delivery in general terms, but allowed the defendant to excuse it by showing circumstances tending to neutralize the presumption of fraud, which would otherwise be derivable from the omission to comply ; and, that the vessel was abroad on the lake, perhaps in a distant port, was calcu- lated at once to relieve the mind from suspicion. But clearly this could no longer be so, when the excuse ceased to operate, by the return of the vessel into the port of Oswego, much less in all future time during her repeated ar-

rivals both before and after the mortgage become forfeited by non-payment of the money secured. In such an event, the mortgagees were expressly authorized by the Demings to take possession, and sell the schooner for the payment of the debt. After her return, therefore, the negligence was calculated rather to excite than allay suspicion that the purpose was something more than merely to secure payment. The debt might have been very honest in the abstract, but might, for that very reason be made a more dangerous instrument in working a fraudulent delay of other creditors. Every statute made to suppress fraud should be construed liberally for the promotion of that end. The principle of the exception should be regarded. The fact of the vessel not being in port, excused the immediate delivery ; but giving to that fact the same operation, after the vessel was perfectly within the control of the mortgagees, would be straining a point in favor of parties engaged in using the very means which the statute had regarded as strong proof of fraud being intended. It would be so construing the statute as to promote, not to remedy the evil. It would be saying to parties, " watch your opportunity, mortgage while the vessel is abroad, and then you are absolutely beyond the reach of *the statute. If you are so lucky as to escape detection from other kinds of evidence, a very common thing, the possession may remain unchanged in all time to come." No. In answer to the fact of non-delivery, the mortgagee can be relieved only by making out such a case as establishes his good faith ; and it is difficult to see how a continuance of possession in the mortgagor, after all reason for it has ceased to operate, should tend to the establishment of such faith, or leave it to be inferred, any more than omitting an immediate delivery without an original excuse.

[ *123 ]

But other arguments are adduced. The vessel was owned in common, the Demings residing at Oswego, the other owners at a distance. The previous arrangements for the season had led to the common appointment of a master, who had entered into an engagement to sail the vessel under the direction of the Demings, on joint account. It is difficult to perceive what reasonable obstacle was presented by any of these considerations to the change of possession, so far as the Demings were concerned. Surely one tenant in common may sell and deliver, or relinquish the control of his interest to another, in spite of any objections from his co-tenants. If the master was under contract, the transfer might have been subject to that, or he might have been released or discharged, or his powers revoked, if there were any dissatisfaction with the change. The registry and other papers might have been altered ; and in short the Demings might have given all their control into the hands of Weed and Thurman, the mortgagees. But no attempt was made to do any of these things. How do we know that the Utica owners would have been dissatisfied with the change ? How that the master

would have been ? None of them were ever consulted. The whole argument lies in a possibility coming in by way of after-thought.

Again : it is said the plaintiffs had notice of the lien by mortgage. This is an objection of a very ancient date—one which has been often made, but never without being overruled. The obvious consequence of listening to it would be, to furnish a ready expedient for protection to fraud of *the kind now alleged in all cases. A creditor having notice of a   [ *124 ] fraudulent mortgage is a reason why he should bestir himself to avoid it.

We are now told that the plaintiffs conceded the mortgage to have been *bona fide*. If that were indeed so, I admit we could not hold otherwise. But the argument misconstrues the admission. It was, that the debt was due at the time when the mortgage was given, that this was entered into at the solicitation of Weed & Thurman, and that it was duly filed at the clerk's office. When it is established as a legal consequence that a debt actually due, secured by a mortgage given on the creditor's solicitation, and filed, necessarily overcomes all evidence of fraud, or, in other words, that it necessarily cuts off all force from the debtor still holding his property, the argument will be conclusive. But the real debt of a favored creditor, a friend or connection, is known in practice to be a very common instrument of fraud. Why should the debtor still hold on to his property ? Doubtless, because it is for his own convenience—probably because the creditor soliciting the preference promises that he will be indulgent to the calls of that convenience ; and thus the debtor is still allowed to continue the man of ostensible fortune and business, drawing in the world to credit him. Thus he is enabled to go on, concealing or pocketing his other effects, till his purposes are still farther subserved by winding up his affairs at the convenient season, and defrauding his tens or hundreds, where otherwise he could have deceived nobody. The mortgagee thus makes himself a party to the false pretences or appearances by which frauds may be and commonly are multiplied ; and what is the excuse ? The debt was a fair one. But the parties fly in the face of the law. They refuse to comply with those forms of business which the law has devised to prevent them from becoming parties to a fraud on their neighbors, and for the more general and enlightened purpose of preventing fraud in general. We have only to ask which is the more important—that the creditor's particular debt shall be saved ? or that the world shall be protected by nullifying the act ? The law must proceed by *gen-   [ *125 ] eral rules. If it allow a non-delivery in one case, it must be allowed in all similar cases. It therefore calls for an open, honest course in all, or gives way only for reasons most strong and satisfactory. It is not the debt which the law condemns for the omission, but the fraudulent means resorted to in obtaining the security. It therefore throws the creditor back

upon a remedy common to all the creditors. If his debt be valid, he may go on and collect it in a legal way ; the law therefore does less here, by way of punishment, than in many other cases of the kind. The presumption is in some cases conclusive. Why are contracts declared void by the statute of frauds and perjuries, when not written, or sustained by part delivery or payment of earnest? Because, if we depart from such means, fraudulent contracts may be pretended and supported by perjury. The law feels its incapacity to reach by direct proof, what in its own nature seeks to conceal its real character ; and therefore prescribes as the penalty of omitting certain solemnities or ceremonies which cut off or much diminish the chances to defraud, that the transaction not attended by them shall be void. In default of direct, it goes to circumstantial proof, giving that greater or less effect according to the magnitude of the evil, the temptations to its commission, and the difficulty of detection by direct means. Weed & Thurman seem to have understood this matter perfectly. Their mortgage provides for a change of possession and sale, even before the day of payment, if they should imagine themselves insecure. I collect from this that they knew there was danger of interference by other creditors. They not only cast this anchor to windward, but finally, fearing that all color of claim had gone, they get the Demings to accommodate them with a voluntary judgment and execution, under which, independent of the mortgage, they might, as they do now, contest the validity of Rood's levy and sale to the plaintiff. The debtors, it seems, were at all events to have the use of the vessel, no matter at whose expense, or at what risk, or what rule of law was violated. Being unluckily detected and exposed, they ask protection from the [ *126 ] court on account of the great merit of their debt. *They may be and doubtless are, in general, very fair men. But as such, they should be the last to desire that a wound may be inflicted upon the law, which they may be the next to feel in their own persons.

It is insisted that this mortgage is within the 7th section, 2 R. S. 70, 2d ed. concerning bottomry, &c., which declares, that " nothing contained in the two previous sections (the 5th and 6th,) shall be construed to apply to contracts of bottomry or respondentia, nor to assignments or hypothecations of vessels or goods at sea, or in foreign ports."

First, is this a bottomry contract? Bottomry is generally defined in the English books as in 2 Black. Comm. 457. He says it is in the nature of a mortgage of a ship. It is when the owner takes up money to carry on his voyage, and pledges the keel or bottom of the ship (partem pro toto) as security for the repayment. In which case, it is understood, that if the ship be lost, the lender loses also his whole money ; but if it return in safety, then he shall receive back his principal, and also the premium or interest agreed upon, however it may exceed the legal rate of interest. This defini-

tion, it will be perceived, contemplates taking up money, on some specific voyage or adventure which may be at more than 7 per cent. interest, because the loan is gone if the vessel be lost. It is a contract of hazard. No transaction or stipulation of that kind appears between the Demings and their mortgagees. The security was given for a precedent debt, and the contract would have been vitiated by an usurious rate of interest. Other points of distinction between bottomry and mortgage are, that under the former, if the vessel be not exposed to the perils of the sea, in other words, if the risk be not incurred, no contract arises. *Emerigon on Mar. Loans*, § 2, *Am. ed.* 1811, *p.* 32. *Id. p.* 34, 38. It is a gaming contract. *Id. p.* 33, 38. It has a character and qualities peculiar to itself. It is different from all other contracts, and forms one of a particular kind. *Id.* 31. It loses its character entirely when the money secured by bottomry was originally advanced on the personal credit of the owner ; and the bottomry bond, or rather what professes to be such, is *afterwards [ *127 ] taken. That is abundantly settled by express adjudication, in the English courts of admiralty, *The Augusta*, 1 *Dodson*, 287 ; *The Hero*, 2 *id.* 139, 146, 7, and in our own. *The Hunter, Ware's R.* 253, 4, 5, *and the cases there cited, viz. Liebart* v. *The Emperor, Bee's R.* 337. *Sloan* v. *Ship A. E. I., id.* 250. *Rucker* v. *Conyngham*, 2 *Pet. Adm. R.* 295, 300. *The Aurora*, 1 *Wheat.* 96. These decisions, it is true, were made in respect to bottomry bonds given by the master. But I apprehend it is so in all cases of bottomry, proper, whether the lien were created by the owner or master. If it be to secure a precedent debt, it comes to the case of a common pledge or mortgage, according to the form of the contract. Beside, the contract is entirely of a nautical character. " The distinction is great," says Molloy, " between money lent to be used in commerce at land, and that which is advanced to sea." 2 *Moll. De Jur. Mar. B.* 2, *ch.* 11, § 8. He adds, as to the latter, " the same is advanced on the hazard of the lender, to carry, as is supposed, *over sea.* Hence it is technically called *pecunia trajectitia ;* and in respect to the great premium allowed, *usura maratima* or *fœnus nauticum. Id., Emerig. edition before cited, p.* 18, *ch.* 1, § 1. The form of a bottomry bill by owner and master is given in *Beawes*, 139, *Dubl. ed.* 1795, and will be found there characterized by all the distinctions I have mentioned. The occasions of the particular voyage are made the ground of the loan, and the risk is as closely tied up to the voyage or adventure itself, as it is in a marine policy of insurance. It may be on time ; but that makes an exception to the general rule. *The Draco*, 2 *Sumn.* 157. In the case at bar, the security was taken for a precedent debt between landsmen, in respect to a land transaction. The reason of the contract is limited to voyages on the ocean or its great navigable arms, in the prosecution of which the merchant often incurs extraordinary risks. Applied to

our inland waters, it would open a wide door to the practice of usury. A lake is no more than the expansion of some river or creek. If allowed on
Lake Ontario, we may next hear of bottomry on Durham boats
[ *128 ]  between that and Montreal, which, in their *way cross a wide
place of the river St. Lawrence, called Lake St. Francois. But here the perils are not near so great as in the rapids of the same river. Hence the transition will be easy to our rivers, to our smaller lakes, and thence to the canals. In that way we might certainly relieve our courts of common law by a division of labor between them and the admiralty ; for another peculiarity of all nautical contracts, either of express or implied lien, is that cognizance of them, exclusive or concurrent, belongs to our courts of admiralty. Would that court, sitting in our northern district, have tried this question ? Had the mortgagees gone there, I apprehend they would have been told at once, that the court was limited to matters at sea, while other magistrates had exclusive jurisdiction of like matters on land. *Dunl Adm. Pr.* 6.

The clear principle of the 7th section is, that in bottomry, the loan being usually, if not always, made for the purpose of enabling the borrower to prosecute some maratime adventure of his own with the aid of the very ship which is put under pledge, the nature and object of the transaction thus implies that the pledgor should keep possession. Indeed, his possession is an element without which the contract loses its distinctive character. And it being quite useful, not to say essential, to the exigencies of foreign commerce, though much less common than formerly, *vide McCulloch's Com. Dict. Bottomry*, it was feared, I think without reason, that the 5th section, though it merely fixed the conditions on which chattel mortgages could be taken, might be construed to interfere with bottomry. Thus the statute might have repealed an important branch in the system of protection accorded by our laws to trade upon the high seas. How little danger of this there was, however, may be inferred from *The Draco*, 2 *Sumn.* 157, which held that a statute requiring the registration of personal mortgages, though without exception, did not extend to a bottomry bond.

The view we have thus taken of the attempt to make bottomry out of the
'  mortgage in question, will enable us to appreciate the objection,
[ *129 ]  that, if not bottomry, it comes *within some other term of exception in the 7th section. That it is touched by the word *respondentia* is not pretended, that signifying a pledge of the cargo, or goods to be transported. 2 *Black. Comm.* 458. It is the same to the cargo as bottomry to the ship. *McCulloch's Com. Dict. Bottomry*. The principle of the exception will here, therefore, be found exactly identical with that which saves bottomry. The goods must remain with the pledgor ; *and see per Story*, J. *Conard* v. *The Atlantic Ins. Co.* 1 *Pet.* 436, 7. The last exception in the section is of assignments or hypothecations of vessels or goods *at*

*sea*, or in *foreign ports.* These words undoubtedly extend to all assignments and all hypothecations conventional or implied either of vessels or cargo, whether by the act of master or owner. Hypothecation, when applied to maratime transactions, is perhaps about the same with bottomry or respondentia, though it is usually predicated of a loan by the master on the vessel, freight, or cargo, made in order to raise money for the necessities of the voyage. *Vid. Abb. on Ship. pt. 2, ch. 3, § 15, 29.* In a more general sense, it is a pledge to secure any debt or engagement, without a delivery or possession. *Story on Bailm. ch. 5, § 286, p. 196 of 1st ed.* It is often confounded with pledge or *pignus. Id.* That either term used in the section would extend to mortgages proper, may admit of much doubt. *Vid. per Story, J. in Conard v. The Atlantic Ins. Co. 1 Pet. S. C. R. 441.* But whatever be the abstract nature of the contracts mentioned in the latter part of the section, a decisive distinction is, that the vessel or goods must be *at sea* or in a *foreign port.* All the contracts intended by the section are of the nautical class. They regard adventures upon the highway of nations, where ship or goods may be long absent, or at great distances in foreign ports. Our western lakes, it is true, are sometimes by a strong figure of speech, called *seas*, more usually *inland seas ;* but no one so speaks or writes of them, when pretending to exactness of expression. Thus the principle of the exception is made to operate uniformly, as it was no doubt intended to do ; not on vessels or goods upon lake and river voyages, which are performed like those of the vessel in question ; *an outward and [ *130 ] homeward trip in a week or fortnight ; not on vessels or goods in a foreign port like St. Johns, foreign in a political sense merely, but reached by lake navigation in a few hours after leaving some port near the state line ; but some foreign *seá port*, where the article mortgaged is, in good faith, beyond the power of immediate delivery. We have already conceded the extent of the qualification implied in respect to short voyages between neighboring ports, by the very section which requires immediate delivery. We have admitted that the want of such delivery does not detract from the idea of good faith, provided the change of possession be instantly made on the return of the article. The ground of exception was well considered by Story, J. in *Conard v. The Atlantic Ins. Co. 1 Pet. S. C. R. 449*, and applied to an absolute assignment of goods at sea. The excuse was allowed because they were delivered as soon as they arrived home. We doubt whether anything more can be allowed either in virtue of the 5th or 7th sections. The principle is, *lex non cogit impossibilia.* The ship or goods are afloat, or far abroad ; not capable of manual tradition. But where the requisite act can not be literally performed, the parties must supply the defect at the earliest opportunity. The delivery must be made when it becomes practicable. Otherwise the exception is at once seized on and abused as a pretence for evading any

change of possession whatever.   No court, in justice to the law or to its own conscience, can at this day, I think, allow that multiplication of arbitrary and unnecessary exceptions by which the  rule requiring a change  of  possession was once almost extirpated.   I attempted to collect these exceptions in a note to my report of. *Bissel* v. *Hopkins*, 8  *Cowen*, 166 ;  in other words, to embody the principal authorities, English and American, as they stood at the time, by which the rule had been enfeebled ; and since that attempt has been approved as successful by Story, J. *Conard* v. *The Atlantic Ins. Co.* 1 *Pet. S. C. R.* 449, I may here  venture  to repeat the  question I there  asked :  " What is the rule worth ?   What does it amount to ?  Does its preservation merit a  struggle ?"   The doubt I still think was properly started.

[ *131 ]  *But the legislature did not  despair, though they found the power of our  judicial sentinels  paralyzed, and  corruption  gradually per-vading  the entire mass of chattel securities.   They made non-delivery con-clusive evidence of  fraud in  such securities, unless good faith can be estab-lished by the person claiming under it.  Was this great act of moral legislation intended to be  left open by its proviso to the same race of  exceptions, which had come near making  its principle entirely barren ?   Was it  intended that colorable excuses should be  submitted to juries as evidentiary of *bona fides*, under the *guidance of  arbitrary judicial discretion* ?   Any thing and every thing being thus submitted by the insolvent debtor and his friend, what is real or fabricated, the weak parts of their case suppressed, and the whole colored by glosses, warped  by chicanery, and perhaps tainted by perjury, was it in-tended that this jumbled mockery should go to the jury under pretence of the case being a hard one, and conclusively disposed of  by them ?   Or does the statute 2 *R. S.* 72, 2*d  ed.* § 4, when  it declares fraudulent intent to be a question of fact, leave it to  be tried like other causes of intent, on facts perti-nent, in the opinion of the judge, according to the general rules of evidence ? We have  heretofore  given one  uniform  answer to this inquiry.   We have withholden the question of bona fides from the jury when the parties have re-fused to change the possession, if change were within their power.   We have considered delivery as the form put forward by the statute to test the honesty of the transaction ; and that the  allowance of one evasive excuse after ano-ther, is but submitting to have the courts of justice and juries imposed upon by pretences readily devised and eagerly raised.

I have already adverted  to the essential  importance of  certain forms, as measures of protection against fraud.   A few remarks more shall  close all  I have to say in respect to the general points of defence.   They all come down to excuses which are not founded in any real necessity.   They insist that ex-cuses arising from the convenience of  the parties concerned, or  the conveni-ences or purposes of  business, should  be allowed.   They mean in

[ *132 ]  principle, therefore, that any excuse which the  parties *interest-

ed chose to manufacture, and call such, must go to the jury and be finally passed on by them, as relevant proof of *bona fides*. It would be enough, I admit, to say that such points have been overruled again and again, both in this court and the court of chancery. But there is a constant press upon the courts by creditors, and especially by debtors, to obtain such a relaxation as shall allow men to place the title of their goods and chattels in one hand, while the possession is in another. The answer of the courts has been, that such a posture of things is false, and unavoidably imposes upon the world. The rule of evidence is, that a man shall be holden to intend the inevitable, indeed the natural or probable consequences of his own act; and shall not be allowed to escape from the intendment until he excuses the being a party to the imposition, by the necessity of the case, such as the impossibility of keeping the title and possession together. A contrary course has been found to result in extensive moral debasement, and led to legislative interposition. The statute was holy, and calls for a ceremony of little trouble in order to fulfil the purpose. Change the possession. That puts the world on inquiry, and they learn how to act with safety. Then if the consideration be not impeached, nor the transaction otherwise shown to be unfair, both parties must be deemed honest as between themselves, in respect to creditors, and the world at large. The *onus probandi* is thrown by the forms of business on the persons who come to impeach the sale or mortgage. If those forms be not complied with, if possession be not delivered, the *onus* lies on the side of the person to whom the assignment or mortgage is made. He must then, the statute says, prove that it was made *in good faith*, and *without the intent to defraud;* which question of *good faith* or *intent is a question of fact for the jury*. That *such is the question to be tried,* and that *such is the power of the jury*, no judge ever doubted. It has been supposed by some that this power has been denied by this court. This is not so. The rule here is no way distinguishable from that laid down by Senator Dickinson, in the late case of *Stoddard* v. *\*Butler*, 20 *Wend.* 543. " While it is cer-     [ \*133 ] tain that the question of fraudulent intent is *one of law*, while the vendor retains possession, and *no explanation* is offered ; it is equally clear that the question of intent, when *an explanation is offered*, is a question of fact. The former is the *prerogative of the court*, and the *latter of the jury*. It is only necessary for the person claiming under such sale to shew, " *that the same was made in good faith, upon sufficient consideration, and without any intent to defraud;* and of the *intent* and *good faith* the jury are the exclusive judges." This rule I admit extends to *all cases*. I take these as the strongest expressions of the strongest opinion that has or *probably* will be delivered in favor of the power of the jury ; and I adopt those expressions in their broadest extent. All they assert is that the *quo animo* is a *question of fact for the jury*, when an *explanation is offered :* that is, as I understand

the phrase, not anything and everything which may be called an explanation ; but evidence *pertinent to the question of fact*. It stands on the footing of any other *question of fact to be determined by the jury*. If the *testimony offered* be pertinent in the opinion of the judge, it is his duty to receive it ; if not, he is bound to reject it. This is a universal rule in relation to trying all questions of fact, which still separates the province of the judge from the jury. It was not denied by the learned senator ; and is as well established as any distinction in the law. Mr. Phillipps in his Treatise on Evidence, the last (*8th Lond.*) *ed., p.* 2, makes these remarks : " The parties to a suit are not permitted to adduce every description of evidence which, *according to their own notions*, may be supposed to elucidate the matter in dispute." Again : " It is the province of the judge presiding at the trial to decide *all questions* on the *admissibility* of evidence." In *Cowen & Hill's Notes to* 1 *Phil Ev. p.* 428, *note* 326, there are several cases cited to enforce and illustrate the following proposition : " The court always protect the jury from irrelevant testimony, by excluding it on objection in the same manner as they shut out other incompetent proof." For instance, after the fraud is shown by the fact of the vendor retaining possession, the jury might desire to hear *evidence of the general and moral character of both parties to the bill of sale, saying, if that character be good, it would authorize them to infer that the parties did not mean to act dishonestly. Yet no court, in the present state of the law, would allow such evidence. *Gough* v. *St. John,* 16 *Wendell,* 646, 653, 654, *and the cases there cited ; and vide* 1 *Phill. Ev. ed. by Cowen & Hill, p.* 176 *of the text, and p.* 456 *of the notes, and the cases there cited.* I put this as one example among many to show the exact difference which I presume my brother Dickinson intended to make between himself and the supreme court. It arises upon the *competency* of evidence, not the *sufficiency*, and I agree with him again, when he says, *p.* 5-14, the statute has given us no power to determine *what particular facts shall or shall not be sufficient evidence of honest intention*. The statute says nothing one way or the other, as to what facts shall *persuade* or what shall be *pertinent*. For all this, the judge is left to the common law. The whole then comes down to the question of what testimony is *admissible*. Was it *admissible* in *Doane* v. *Eddy,* 16 *Wendell,* 522, to prove the debt a fair one, and that Doane wanted possession for the purposes of his business ? We held not, because the cases had always, at least a large majority of them, held such proof to come entirely short of rebutting the strong presumption of fraud arising from the possession not being changed. The statute declaring that from possession you shall infer fraudulent intent, the law has been settled for 200 years that a good consideration is no answer. *Roberts on Fraudulent Conv.* 548, *ed. of* 1800, deduces the following rule from *Twyne's case,* decided in the reign of Elizabeth : " Evi-

dence of the fraudulent intent *supersedes the whole inquiry into the conside-ration ;* for no merit in any of the parties to a transaction can save it, if *it carries intrinsically, or extrinsically* the plain characters of fraud." That is the common law to this day. The statute does not deny it. No case ever held the contrary. The rule was again followed in *Randall* v. *Cook,* 17 *Wendell,* 54. So far we have one zero. Need I say that if the fact or facts proposed in proof as an answer to the presumption amount to nothing, they *are not admissible;* in other words they are *in-* [ *135 ] *competent,* and as such the judge is bound to exclude them, or tell the jury they are nothing; and if they find against his direction, then to grant a new trial ? This is the law of all cases, either where improper evidence is received, or the jury find against its weight. It is so whether the intent be declared a question of fact for the jury by common law or statute. The words *questions of fact for the jury,* are not new ; they may apply to every possible issue, according to the nature of the evidence ; and they may not apply at all. If the evidence be such as to leave a question open for the jury, they must decide; otherwise not. If they have a right to say that, because I have a debt against A., I may take his bill of sale or mort-gage of personal property, and still leave him in the use of it, without being subjected to the presumption of frauds as against his other creditors, then the rule of this court is wrong. But to say that a jury may decide as they please, for or against the weight of evidence, is too strong at this day in res-pect to any question of fact. Every experienced judge knows, that a real debt of some amount is usually resorted to and wielded as the most deadly instrument of fraud. The practice of which I am speaking is usually called among the people at large *covering property.* A friendly creditor is com-monly resorted to, because he holds a debt which will make the *best cover.* Leaving such of the insolvent debtor's property as is exempt by statute from execution—a cow, sheep, hogs, furniture, &c. the debt is used to *cover* all the rest. If it be not and cannot be made quite large enough, there are generally some articles which can be eloigned or concealed, money, choses in action, and other light small portable things. The latter are frequently ta-ken away by connections or intimate friends with the assent or connivance of the debtor. He is thus apparently stripped, reduced to such appearance of beggary as will excite sympathy in the breasts of a humane jury, and then produced as a witness on the stand to prove the covering debt is a fair one, &c. He can always be made a competent witness by a release, and is generally so without one. As the transaction is for his benefit, there is great danger that he ˉmay perjure himself. He is sure      [ *136 ] to make the debt as large as his conscience will allow. He gene-ralizes. He remembers debits, but forgets credits, insomuch that the very per-sons he is struggling to defraud, are often deceived into a belief that the

debt is much larger than it really is. Transactions like this, are so common that a judge knows them at a glance ; and I remember few instances wherein a jury has failed, under his direction, to stamp the retaining of possession with reprobation, as leading to an inference that the transaction was attended with the usual circumstances of corruption, or others newly devised. Debts are sometimes created by a collusive trial and recovery, or a collusive arbitration, in which the debtor and his friendly creditor agree to appear as angry and adverse litigants. In short they have the whole field of device and imposition to themselves ; and they generally succeed partially or wholly, unless the defrauded creditors are allowed to insist on the continuing possession as a reply to the glossings and colorings of the transaction. Previous to the statute putting mortgages on the same footing with bills of sale, (which statute was intended to repeal the decision in *Bissell* v. *Hopkins*, 3 *Cowen*, 166,) the fraudulent parties were almost sure to succeed by putting the transaction in the form of a mortgage. But in *Doane* v. *Eddy*, there was added *charity, brotherly affection*, and *gospel purposes*. We have all heard of *pious frauds ;* and I shall presently examine the value of that charity which covers a brother's or a neighbor's property against his creditors. At present I will only say *mene tekel*, &c. and set it down as another *zero* in the chain of proof offered by way of explanation. The principle has, therefore, obtained an almost universal footing that the mere proof of a debt, to whatever amount, shall not be allowed to excuse the continuance of possession ; and that it cannot be so regarded by a jury, however necessary the use of the property may be for the debtor. These two circumstances prove nothing of themselves. They do not make an *explanation*, nor can the jury regard them as sufficient to overturn the presumption of fraud, derivable from the possession of the debtor. They are not pertinent evidence *for that purpose, unless you go farther, or at least propose to go farther, and show that the articles were of such a nature, or so situated at the time that the possession could not be changed ; and that as soon as it could, the change was effected. There is not a doubt that the present statute intended to enact the principle of *Edwards* v. *Harben*, 2 *T. R.* 587, extending that principle both to bills of sale and mortgages. That is the principle held by a majority of this court in *Doane* v. *Eddy*. We certainly preferred that the reverend gentleman should in that case rather give up his horse to his creditors, than ourselves to give up what we thought an important general principle of evidence. I understood my brother Dickinson, with whom I was associated in deciding *Stoddard* v. *Butler*, to feel hurt by our decision in that case. For it, I am deeply responsible, and should regret its being wrong. I decided it at the circuit on a principle which I have uniformly acted upon for many years ; and which I believed to be as old as the statute of Elizabeth. I would not have allowed a market-

[ *137 ]

man or a farmer thus to keep his horse from his creditors for business purposes ; and I could not distinguish the principle in those cases from that of the clergyman, though respectable, as I knew him to be by reputation. It was no more than possession for the purpose of his professional business. Though that was holy, the principle was of the same character, and it was better, I thought, for him to borrow another horse, or even to do without one, than by relaxing a healthy moral and legal rule open the flood-gates of general corruption. My learned brother remarked, in *Stoddard* v. *Butler*, that " neither the legal nor the moral code should be administered for the sole benefit of creditors," *p.* 544 ; and by what follows, I infer he is in favor of the system of leaving property sold or mortgaged in the hands of insolvent debtors. I can only answer that here, if the debtor be honest, the code does, in the very nature of the question, respect creditors alone. It lies exclusively between them. It is not material to the debtor which of them has the property, any farther than as one may be a more useful instrument than the other towards enabling him *to keep that which his creditors are entitled to ; not only in nominal right, but actual possession. Senator Dickinson supposes that this is to *trample on the ordinary charities of life*, that it ministers to the *mercenary passions* at the expense of the benevolent affections. With deference, I have always thought of this matter in a different light. I have considered it the paramount duty of an insolvent debtor, and an insolvent is always poor, to surrender the possession of his property for the payment of his debts. If compelling this, ought to be repudiated as ministering to the *mercenary passions*, and *violating the charities of life*, then the legislature ought to pass a law exempting *all property*, as well as body, from arrest. It seems to me, we have no right short of that, to adopt *a system of charity* which shall require creditors to forbear the only means left to collect their debts. Beside, I have already ventured to suggest, and endeavored partly to show, what sort of charity such a principle produces. It is ordinarily but another name for fraud, sometimes mixed with perjury.

Another learned senator, brother Verplanck, who also sat with us in *Stoddard* v. *Butler*, and whose opinions are always heard and read with pleasure and edification, amplified the principle of evidence. At page 551, he says, " If then there be *positive* evidence of a *fair and full consideration* paid, of the existence of *reasonable motives* for not requiring delivery, such as *may and do sway honest men*—for instance, *filial*, or *parental* or *brotherly affection*, or the *convenience* and *usages of business*, together with *that publicity* which *excludes the idea of intended evasion of law*, or *holding out false credit*, all the requisites of the statute seem to me to be fully complied with, in the strictest agreement with its *letter* and in perfect conformity with its *spirit, intention and policy*." The *letter* of the statute is very general, and

[ *138 ]

accordingly all the circumstances of conformity with it are properly put forward by the learned senator as matter which appeared to his mind constructively not only *competent* but *sufficient* evidence to overcome the presumption of fraud. I have already considered the force of the *positive evidence* usually called in to show a *full consideration*. *An appearance of *reasonable motives*, &c. such as *may and do sway honest men*, are of easy devise, and there are hardly any which may not be devised, and urged upon a jury with plausibility. The example put, *of the convenience and usages of business*, is extremely comprehensive, and if adopted will be rapidly extended by the secret managememt of insolvent debtors and their *friendly* and *select* creditors, real or feigned, to all bills of sale and all mortgages. With deference, it seems to me that the allowance of this example alone would operate as a virtual repeal of the statute. The other examples, too, of *filial*, *parental* or *brotherly affection*, may be easily expanded into the same consequence. It is confined in the expression to near connexions. The practices of such in the covering of property have already been greatly complained of. Judges on the circuit have seen such charity overflow when the creditors of a poor friend are kept at bay. But the circle cannot be thus confined. It is not that sort of *cold charity* which requires a spur from the preacher of morality. It is an active charity running ahead of the sheriff and his execution, though he be urged forward by creditors, themselves actuated by all the power of *the mercenary passions*. It cannot be restricted to a father, a son, or a brother who happens to be a creditor. The principle lies in supposed friendship or affection; it may, therefore, easily be extended to *general charity*, as put by my brother Dickinson, and thus be made as broad as the *conveniences or usages of business*. It may appear at first to be the mere dropping of a pebble in the lake; but,

> " The center moved, a circle straight succeeds,
> " Another still and still another spreads;
> " Friends, parents, kindred, first it will embrace,
> " The county next.——"

The objection is, in short, that when *the conveniences and usages of business*, and of *charity to debtors* are recognized as within the range of evidence proper to submit to a jury, they to be told that either of these may be allowed as an answer to the presumption, every fraudulent transfer will be clothed with the concocted appearance of one or the other, to be, if necessary, sustained by perjury. Accordingly the disallowance of such evidence has, to most judges, *seemed necessary. There is, I admit, one English case where the principle of charity was allowed: *Kidd* v. *Rawlinson*, 2 *Bos. & Pull.* 59. The debtor's brother-in-law purchased in his goods under an execution, paid the money and allowed them to remain

[ *139 ]

[ *140 ]

with the debtor. Yet the court agreed that, had the purchaser been a creditor or conventional assignee, he could not have maintained his purchase, however fair the consideration might have been. In *Edwards* v. *Harben*, there was a full consideration. Now the charity in *Kidd* v. *Rawlinson* is claimed as a protection in relations from which the very case professed to withhold it. It was claimed in *Doane* v. *Eddy*, in *Stoddard* v. *Butler ;* at the circuit, it is a matter of course to claim it as a protection for almost every fraudulent sale. It comes for a creditor who has got a bill of sale or mortgage. He *alone* is then charitable. Those creditors who oppose him are *mercenary ;* and he runs to stop their execution and save the debtor from oppression. Charity is indeed among the most lovely of the social virtues ; but is there any treatise on ethics which enrols such a case as coming within its territory ? It is not now necessary to say whether *Kidd* v. *Rawlinson* can with safety be received as the law of any case ; but it seems to me entirely clear that if maintainable at all, the principle cannot be extended. That case was once recognized by this court, in its restricted application, *M'Instry* v. *Tanner,* 9 *Johns. R.* 135, 6. The consequence was that the most important *charities* of the kind in question were exercised by a purchase at sheriff's sale, the debtor himself often secretly furnishing the money by which it was carried on. Evidence easily manufactured is deceptive in its own nature. It is, like the declarations of a party in his own favor. Parties may make a *debt*, parties may make *convenience* and *usage of business*, parties may create appearances of *poverty*, of *beggary*, and *charity*, and if these pass for evidence, they will be all simulated. They should be rejected on the same principle which excludes the declarations mentioned. It still appears to me, therefore, with great deference, that the rule established in this court and in the court of chancery, and certainly not as yet shaken by any *judicial decision of the court of errors, *is sustained both by rea-     [ *141 ] son and authority.

If Rood was to be believed, no serious question can be made that the levy was complete. There was an actual entry, the vessel being in the sheriff's power, and notice to the defendants in the execution. These acts were never doubted to be sufficient. No formal inventory is necessary. *Haggerty* v. *Wilber*, 16 *Johns. R.* 287. *Wood* v. *Vanarsdale*, 3 *Rawle*, 401, 405, 6. That the witness was not worthy of confidence it is impossible for us to pronounce, since his credibility has been sanctioned by the jury under a proper charge from the court.

The sale took the usual course of one where the debtor has, in conjunction with some friend, been tampering with the title. The deputy sold the right of the Demings. What was that ? The mortgage being void for fraud,

* See *Smith & Hoe* v. *Acker*, 23 *Wendell*, 653, decided *subsequent* to this case, although reported previously.

as against the bank and all persons purchasing under their execution.   The right of the Demings was perfect in one undivided unincumbered half of the vessel.   The deputy said he would sell that right, and let the purchaser fight it out.   Yet the smallness of the sum bid is relied on as a case of inadequacy which, *per se*, should vitiate the sale, or at least raise the inference that the plaintiff meant to purchase subject to the mortgage.   He knew that he must do so subject to a pretended mortgage, and had notice, at the time, in the phrase of the sheriff, that he must fight for whatever he got.   The smallness of the consideration may thus be accounted for upon grounds far other than any intent to admit the validity of the mortgage.   The defend-ants here are indebted to the acts of the mortgagors and mortgagees, for the smallness of the bid.   It arose from the cloud which their manner of doing business had brought upon the title.

It is said the inference that the plaintiff intended to purchase an equity of redemption merely, is strengthened by the late statute.   2 *R. S.* 290, 2*d ed.* § 20.   That section declares that when goods or chattels shall be *pledged*, the right and interest of the pledgor may be sold on [ *142 ] execution, *and that the purchaser may take possession on com-plying with the terms and condition of the *pledge*.   The reason-ing is this : as there were two intents open to the plaintiff, one to purchase absolutely, the other subject to the mortgage, it should rather be intended, considering especially the notice of the mortgage given, and the smallness of the bid, that the latter intention was the true one.   The reasoning would be strong, upon two suppositions : first, if the defendants' counsel con-strue the 20th section rightly ;   and  secondly, if the mortgage had been really valid in respect to creditors:   White, the plaintiff, might then have said in an action against him, " As between a lawful and unlawful in-tent, I claim that the former shall be presumed ;" and he could certainly have no objection that the rule of presumption should apply here.   Even then, however, it might be overcome, and would be clearly overcome by the evidence here that he acted in the purchase adversely to all claim of the mortgagees ;   and all possible doubt is dissipated, when the mortgage is found to be fraudulent.

Beside it is by no means clear that the word *pledge*, the only word used in the 20th section, when applied to goods and chattels, comprehends a *mort-gage*, though it may when applied to real estate.   2 *Black. Comm.* 157.   In the latter case, however, the equity of redemption, according to the doctrine of this court, is the subject of sale independent of any statute.   *Waters* v. *Stewart*, 1 *Caines' Cas. Err.* 47.   A *pledge*, taken in its strict sense as ap-plied to chattels, is a bailment, that is, an actual delivery of the thing, for the security of some engagement.   But by a grant or conveyance of goods in gage or *mortgage*, the whole legal title passes conditionally to the mortga-

gee.   The distinction is very exactly shown in *Story on Bailm. ch.* 5, § 286 and 287, *1st ed. p.* 196 ; and is quite familiar to the profession.   That the statute means a *pledge* in its strict sense is rather inferrible too, if there were otherwise any doubt, by the manner in which it speaks of the purchaser taking possession on complying with the terms and conditions of the *pledge.*   The words are hardly applicable, in their general sense, to a case where the whole title has passed conditionally, and where, as is well understood, it becomes absolute *on default of payment at      [ *143 ] the day.   *Patchin* v. *Pierce*, 12 *Wendell*, 61.   Clearly, after the title becomes absolute, the statute cannot divest it.   *See per Story, J. in Conard* v. *The Atlantic Ins. Co.* 1 *Pet. S. C. Rep.* 441.   I admit the idea has been started that there is still an equity of redemption remaining, which may be enforced in chancery.   *Story on Bailm. ut supra,* § 287.   1 *Pet. ut supra,* 441 ; and this was strongly favored by the remarks of Mr. Justice Nelson in *Patchin* v. *Pierce.*   We are, however, sitting in a court of law ;   and such an equity had never before the statute, nor has it since that I am aware, been holden tangible by legal execution.   In the case before us, when Rood came to sell, the mortgage had long since been forfeited ;   and, if good against creditors, the title was absolute in the mortgagees.

The only remaining question respects the competency of W. F. Deming, one of the mortgagors.   He was offered as a witness for the defendants, but was rejected by the judge as interested to testify in their favor.

Under the peculiar circumstances of this case, he was, we think, clearly incompetent, for the reason which governed the learned judge in excluding him.   If the defendants maintain their position, that makes the vessel and furniture worth about $2000 to the witness by way of discharging his debt due to Weed and Thurman.   If the credit of that sum be displaced, then the same property cannot avail him more than *three dollars*, and both he and his mortgage creditors were privy to the concourse of circumstances from which his interest arose.   It is supposed that as between him and the mortgagees, the credit is conclusive.   If that were so, I admit his interest would lay the other way, and he would be technically competent   But we think that the mortgage failing to hold, the credit arising under that may be withdrawn, the same as it may confessedly be in respect to the execution.   Had the mortgage itself been given and accepted as an absolute payment for the $2000 ;   had so much of the debt then been extinguished by the joint agreement of the parties, though the act were fraudulent ;   yet the law would never allow the credit to be disturbed as *between     [ *144 ] them.   It would not interfere as between them, to disturb any contract completely executed.   It will insist on holding parties to the position in which they have fraudulently placed themselves.   So far as the contract, or any part of it, remains executory, it will not be enforced.   *Nel-*

lis v. *Clark*, 20 *Wendell*, 24. Here, it is true, the conditional title passed; but it was merely by way of collateral security. The security could not operate as payment, except by a future sale, under a power contained in the mortgage or implied by law. In this respect the contract was executory; and being fraudulent, it was void *ab initio*. The subsequent sale was not available for any purpose. I do not deny that it might have even operated as a binding payment, had other creditors been kept out of the way; but before the mortgagees had touched the vessel under the power, the bank was in motion, and Rood had levied. It is true the mortgagees then took the alarm, and in December, after the schooner had frozen up, took a formal delivery from the Demings, removed the tackle and obtained their judgment bond. But before this demonstration all their right had gone; the schooner was in the custody of the law; and both the Demings and their mortgage creditors were trespassers against the sheriff. He went on, and previous to any sale by the mortgagees, or application of the proceeds in payment, had swept away every vestige of title by the auction sale to White, the now plaintiff. In truth, the mortgagees never took a single step valid even as between them and the Demings, after the mortgage had been executed. Neither the one nor the other could interfere or bring any action in respect to the vessel. The law had taken it away from both, under execution against the Demings. Had the mortgagees been allowed by the bank to proceed and make a sale, and endorse the $2000 as a credit, under the power derived from the Demings, I do not deny that the law would hold them to a consummation in which they might both be said to have participated. But [ *145 ] the matter never having gone beyond the execution of the collateral security; that proving in fact unavailable, by the vessel being taken away, before the mortgagees began to *execute the power, it was nullified to all intents and purposes. The credit was given without the poor sanction even of a fraudulent authority. The very next moment after the delivery in December, the sheriff might rightfully have ousted them by recaption or writ of replevin. Before the levy, they might have taken possession, or brought trover against the Demings, for the law will follow by remedies the notion of an executed contract. The fraudulent alienee of land may bring ejectment against the alienor, and the fraudulent vendee or mortgagee of goods may have trover against the vendor. *Vid. per Nelson, Ch. J. in Nellis v. Clark*, 20 *Wendell*, 39. But the mortgage, though an executed contract as to the title, was executory as to payment. That consequence was to grow in future out of a remedy by possession and foreclosure or sale. Neither of these was ever executed. Assuming what the argument for Deming's competency must assume, that the adverse claim of the bank was valid, and rightfully enforced by the levy, the execution of the power thus being stopped midway, the credit of $2000 becomes lost to

the witness. It is no more in legal effect, than if he had turned out an una-vailable chose in action, as a collateral security. A recovery by the plaintiff here is equivalent to an eviction of the mortgagees, and would, therefore, be evidence against the witness in any defence he might set up, founded on payment by the mortgage sale. The balance of interest in favor of the de-fendants, thus stood as $2000 to $3.

The result is, that a new trial must be denied.