[*General Term, January,* 1872.]

## FIRST NATIONAL BANK OF PARKERSBURG *v.* CRAWFORD ET AL.

Where a draft is discounted by a bank and passed to the credit of the drawer, and he is allowed to check against it, and does so, the bank is a holder for a valuable consideration.

In such a case, though the drawer's account is overdrawn, at the time of the discount and at the time of the maturity of the draft, the court will not inquire into the amount checked out, but the consideration once existing will be held good as to the whole note.

Where the bank, in West Virginia, is secured by a trust deed for all indebtedness, and the drawer is a bankrupt, and the trust property has been sold, under the order of the United States court in West Virginia, in bankruptcy, the acceptor is not entitled to a stay of execution upon the judgment and an order to the bank here to account to him for the proceeds, on account of equities existing between him and the drawer, of which the bank had no notice, at the time of the discount.

*Gallagher & Stearns,* for plaintiff.

*Stallo & Kittredge,* for Burckhardt & Co.

WALKER, J. This suit is brought upon a draft drawn by Crawford upon Burckhardt & Co., accepted by them, and discounted by the plaintiff. The case was reserved by the court in Special Term for hearing and determination upon the evidence as agreed upon by the parties, and certified by the court.

After a careful examination of the evidence, we find the facts to be as follows:

Crawford was in the oil business at Parkersburg, and kept his bank account with the plaintiff. He was in the habit of shipping oil to Burckhardt & Co., the defendants in this case, and the bank had frequently discounted his drafts upon Burckhardt & Co., which had always been duly honored—at least except in one instance long before, when it appears the draft was drawn by mistake.

On August 1, 1868, Crawford's account was overdrawn at the bank $3,953.47. That day he drew two drafts on Burckhardt & Co., one for $1,000 at sight, and the other for the same amount at thirty days, the latter being the one on which this suit is brought, and took them to the bank to discount. They were not then accepted by Burckhardt & Co. The cashier discounted them, the proceeds being $1,990.06. Of this, Crawford paid $21.60 for interest on some other transactions, leaving $1,968.46, which was passed to his credit on his account.

On the same day, but whether before or after the drafts were discounted, can not now be ascertained, eight checks of Crawford's, amounting to $235.50, were presented and paid, so that at the close of the day Crawford's account was overdrawn $2,220.51. From August 1st to August 17th, Crawford made no deposits in the bank in any way, but during that time he drew checks to the amount of $1,337.50, the exact dates of which were not shown, which were presented at the bank and paid.

The two drafts were transmitted together by the bank to Cincinnati, where the sight draft was paid by Burckhardt & Co., on August 4th, and the time draft accepted by them.

It is claimed by counsel for Burckhardt & Co., that the drafts were simply taken for a pre-existing debt, and that the bank did not give any further credit on account of them; but we find the facts to be otherwise. The testimony of Chancellor, the cashier, is directly to the contrary. He says, in his first deposition, " It was discounted solely in the faith that Burckhardt & Co. would accept and pay it—solely on that faith—as Mr. Crawford had a line of discount with the bank as much as it would let him have upon his own credit." This statement is repeated several times. Again, he says, in his last deposition (taken at the suggestion of the judge who heard the case below), in answer to the question, what became of the proceeds of this draft:

" It went to Mr. Crawford's credit, and he checked it out for the purposes of his business. There were two drafts

drawn at this time, one at sight, and the other at thirty days, both on Burckhardt & Co., for one thousand dollars each.   They were discounted on the 1st day of August, 1868, and the proceeds of both placed to his credit in the regular course of business; the sight draft was paid, and the other was accepted and not paid.   The most of the money was checked out by Mr. Crawford by a number of checks in about a couple of weeks, in the regular course of his business.   The most of the money on both drafts was checked out by Mr. Crawford."

It was claimed that the figures as given did not support this statement, but we think that they substantially do. They show that Crawford checked out, between the 1st and the 17th of August, the sum of $1,337.50, while if the payments on August 1st were to be taken into account, it would amount to $1,573.   But the first sum is too large to be attributed to the sight draft, as the proceeds of that were less than $1,000.   We find, therefore, that these drafts were discounted on the faith that Burckhardt & Co. would accept them by the bank in the regular course of business, the proceeds placed to Crawford's credit, and that he was allowed to draw against both, the time draft as well as the sight, and did do so to a considerable extent.

It was also claimed that the bank took these drafts at the time, with notice that they were drawn against oil to be shipped in the future, but we find upon the testimony that they had no such knowledge.

It was also claimed that the bank prevented Crawford from shipping oil to meet this draft, knowing that it had been accepted on the promise that oil would be shipped. The cashier says that after the acceptance of the draft, and before its maturity, " Crawford represented the fact that he must have some money for immediate purposes—perhaps to pay his hands—and that he was owing Burckhardt & Co., and that he could n't ship to them and draw against the oil; and the suggestion was made, but I do n't know by whom, that he should ship to his eastern correspondent,

and draw there. The president of the bank, Mr. Camden, was present at this conversation. This was the first intimation I had that Crawford could not ship oil to Burckhardt & Co. and draw against it." Frederick Burckhardt says: "Saw the president, Camden. He said he had advised Crawford not to ship the refined oil he had on hand. He was aware of Crawford's indebtedness to us. Advised Crawford's whole course."

And on cross-examination he says: "Camden says he had advised Crawford not to ship the oil he had promised to ship, for this draft. This was before the maturity of the draft."

But he went to Parkersburg on the receipt of the letter of August 18th, so that this conversation was long after the discounting and the acceptance. For the account of Burckhardt & Co. shows that the sight draft was paid on the 4th, and the testimony is that the time draft was accepted at the same time. Taking all this together, we can not find such conduct on the part of the bank as to prevent them from recovering on that ground.

We find that on the 17th of August, Crawford deposited in the bank the sum of $1,575, and that from that day until August 27th, when transactions between them ceased, he deposited nothing more, and checked out $416.75, leaving his account at the close overdrawn $1,982.72.

We find from the evidence that as against Crawford, Burckhardt & Co. had a good defense, the drafts having been accepted on the promise that Crawford would ship to them certain oil, which he failed to do.

We find also that at the time of discounting these drafts, the cashier of the bank—Chancellor—was trustee in a trust deed from Crawford, the trust declared being, first, to secure the payment of certain specified promissory notes of Crawford's held by the bank, " and to secure the payment of all notes or drafts made, drawn, or indorsed by the said Wm. H. Crawford, and discounted by said bank, in renewal of the notes aforesaid, either for the same or a

different amount, and further, to secure the said First National Bank of Parkersburg the payment of all notes and drafts made, accepted, drawn, or indorsed by the said Wm. H. Crawford, and discounted by the said First National Bank of Parkersburg, and also any overdraft or other indebtedness of any kind of the said Wm. H. Crawford to the said First National Bank of Parkersburg, not exceeding in the aggregate the sum of twenty thousand dollars;" and that since the maturity of the draft the trust property has been sold by the trustee, under an order of the District Court of the United States, in bankruptcy, and that it was purchased by the bank, and is now owned by them; that the price paid for it at that sale is not sufficient to discharge the prior liens and certain promissory notes of Crawford's held by the bank, on which there was no other security. Upon this state of facts, two questions are made:

1. It is claimed by defendants, Burckhardt & Co., that the plaintiffs are not *bona fide* holders of the note for such a consideration, as to shut out their equitable defenses against Crawford.

The case of *Roxborough* v. *Messick,* 6 Ohio St. 449, is the leading case on this point in Ohio. It holds that where negotiable paper is taken *in payment* of a pre-existing debt, the holder is a *bona fide* holder for value, and is protected from the equities existing between the original parties.

But if it be not taken as payment, but only as collateral security, without any consideration whatever, stipulation for delay *or credit being given,* or right parted with, then he is not a holder for value.

And on page 454, Judge Swan says: " When the note of a third person is transferred *bona fide* before due, as collateral security, and for value, such as a loan *or further advancements,* or stipulations, express or implied, for further time to pay the pre-existent debt, *or a further credit,* or a change of the securities of the pre-existing debt, the assignee of such collateral will be protected from infirmities affecting the instrument before it was thus transferred.

Nor do the other cases in Ohio, referred to by counsel for Burckhardt, change this doctrine at all. *Merrick* v. *Boury & Sons*, 4 Ohio St. 60, 67, was a case where Merrick, owing Boury an account, sent him his own note for the balance, which he admitted to be due. Boury & Sons notified him by letter that they had passed the note to his credit, and also that they had added the exchange to the note, that being their custom. Boury & Sons having to sue for their money, Merrick defended against the note on the ground of the alteration, and claimed that the original debt had been extinguished by taking the note. It is with reference to this state of facts, so different from what we have here, that the court uses the language relied upon by the counsel.

"That the note was passed to the credit" of the maker, by which we understand that it was put to his credit on the creditor's books, is, in our judgment, a very slight circumstance, and just what usually takes place when a note is given to a merchant.

But when a bank places a sum to the credit of a party, *and allows him to check against it*, it seems to us that a very different state of facts is presented.

The case of *Leach* v. *Church*, 15 Ohio St. 169, following *Merrick* v. *Boury & Sons*, is inapplicable here for the same reasons.

The other case cited by counsel was *Bright* v. *Judson*, 47 Barb. 29. But in considering this case, it must be remembered that the New York courts have always refused to follow *Swift* v. *Tyson*, 16 Peters, 1, in holding that *payment* of a pre-existing debt is a sufficient consideration, while our courts have followed *Swift* v. *Tyson* in both *Carlisle* v. *Wishart*, 11 Ohio, 172, and *Roxborough* v. *Messick*, supra.

This case, therefore, would have been decided differently here, as it is distinctly stated that the note was received in payment and satisfaction of the pre-existing debt. But even in New York, it would be held that a sufficient consideration was shown by the circumstances of

this case for this, as is shown by the cases of *Bank of Salina* v. *Babcock*, 21 Wend. 499; *Bank of Sandusky* v. *Scovill*, 24 Wend. 115 ; *Scott* v. *Ocean Bank*, 23 N. Y. 289.

We, therefore, are of opinion, upon the facts shown, that the bank were such *bona fide* holders for value as to be protected against any equities between the original parties, and that they are entitled to recover the amount of this draft against Burckhardt & Co.

The counsel for Burckhardt claim upon the facts relating to the trust deed, as to which there is no dispute, that they are entitled to be subrogated to the bank under the trust deed, and ask, in argument, that judgment be stayed until the bank account to them for the property held under the trust.

These are not the averments nor the relief prayed for in their answer, but it was stated on the hearing that it had been agreed that any amendments might be made. So we have considered it as if their answer was amended to set up the facts as we find them, and pray for this relief. This point was not argued at all, nor were any precedents for such a course cited. Whether this is a case of subrogation or not, we do not decide, but we do hold that the parties have no right to a stay of execution on this judgment, inasmuch as their right to subrogation does not arise until the payment of the judgment.

Whether, after the bank has satisfied itself, if it can, for the debts which Crawford owes it, Burckhardt & Co. have a right, as against other creditors, to come in and claim the benefit of the trust deed, to the exclusion of other creditors, or whether the purchase by the bank is valid, are questions between them and the other creditors, which seem to us properly to arise in the bankruptcy proceedings, but not here.

Judgment will therefore be entered for the plaintiff against Burckhardt & Co. and Crawford, but the entry may be so drawn as to show that the rights of Burckhardt & Co. under the trust deed, if they have any, and whatever they may be, are not affected by this decision.