By the Court. Duer, J.
It is certain that the negotiable note of the plaintiffs, which is the subject of controversy in this suit, was taken by the defendants in the ordinary course of business, without any knowledge or suspicion of the equity which is now relied on to impeach their title. Heither at that time, nor at any subsequent period until near the commencement of this suit, had the officers of the bank any notice, actual or constructive, of the facts upon. which the plaintiffs found their claim for relief. The only question, therefore, is, whether the bank is a holder of the note for a valuable consideration.
The note was discounted at the request of Howard & Lathrop, the payees and indorsers—the proceeds, however, were not paid to them, nor passed to their general credit, but by agreement, were applied to the extinguishment of an existing debt. The bank had -previously discounted for them their draft upon the plaintiffs, which had been returned unaccepted, and it appears from the entry made at the time in the books of the bank, that the note was accepted in exchange for the draft. The note, however, was discounted, since it appears from the same entry, that the interest for the time it had to run, was deducted from the sum credited to Howard & Lathrop, and hence the entry is only a form of stating, what was certainly the case, that the proceeds of the note were applied to the satisfaction of the draft. That the parties meant to extinguish the subsisting debt, is rendered evident by the fact that the draft, the proper and sole evidence of the debt, was delivered up to the drawers.
The case, therefore, is exactly the same, in all its material circumstances, as that of The Bank of Sandusky v. Scoville and others, (24 Wend. 115;) nor in principle is it distinguishable from the previous case of The Bank of Salina v. Babcock, (21 Wend. 99,) and the subsequent case of The Mohawk Bank v. Cary, (1 Hill, 512,) and unless the judgments of the supreme court in these cases are to be rejected as evidence of the existing law, they must of necessity control our decision.
*225 In The Bank of Sandusky v. Scoville, the note in controversy was transferred to the hank for the purpose of satisfying an existing debt, but no money was paid to the person making the transfer, and the application of the proceeds to the payment of the debt, appeared only from an entry in the books of the bank. The court said that the transaction was substantially the same as if the proceeds had been paid in cash to the person making the transfer, and he had personally applied them to the satisfaction of his debt; and they added that the bank in relinquishing the debt parted with value. It is true that the defence in this ease was founded upon a provision in the revised statutes, since repealed, which protected the holder or indorser in good faith, and for a valuable consideration, of negotiable paper, tainted with usimy, (1 R. S. 772, §2;) but we have been unable to discover any reasons for supposing that the words, “ valuable consideration,” as used in this statute, were meant to be understood in any different or wider sense, than that which the law attributes to them in all analogous cases. At any rate, the opinion of the supreme court, it is certain, was not founded upon any such hypothetical distinction, since they refer to them former decision in The Bank of Salina v. Babcock, as having settled the principle by which they were governed. In the case of the Salina Bank it was not pretended that the note in question was void for usury, but the fraud which was relied on as vitiating the title of the bank, was precisely of the same nature as that of which the plaintiffs complain in the present suit.
Whatever doubts, therefore, might previously have existed, arising from prior decisions of the same court, the cases to which we have referred plainly established the doctrine, that the mere discharge of an antecedent debt is a valuable consideration, within the meaning of the rule which protects and confirms the title of the holder for value of negotiable paper, when the transfer is made in the usual course of business before the paper has arrived at maturity.
It was, however, contended upon the argument, that this doctrine has since been overruled, and that the more recent decision of the court of errors in Stalker v. McDonald, 6 Hill 93, has settled the law, that the transfer of negotiable paper upon no *226 other consideration than the discharge of a precedent debt, gives no security to the title of the holder, but leaves him exposed to every defence that might have been urged against the person making the transfer; and that such is the effect of that decision, we believe has been the general impression of the bar. We are Satisfied, however, from an attentive examination of the case, that it neither requires nor justifies this interpretation, but that the court of errors meant only to re-affirm its own prior decision, in the leading case of Coddington v Bay, 20 Johnson 651. The only question that was discussed by the counsel, or that could properly arise upon the facts, was whether the court should adhere to that decision or renounce its authority, in deference to the judgment of the supreme court of the United States, in Swift v. Tysen, 16 Peters 1. There was no question as to the effect of a transfer, intended to operate, and actually operating, as a payment of a precedent debt. The notes in controversy in Stalker v. McDonald, had been transferred to the plaintiff in error, not for the purpose of then satisfying, but as a collateral security for the eventual payment of an existing debt, he retaining in his hands the evidence of the debt, and never for any period of time relinquishing the right, or losing the power, of enforcing its payment, and it was upon these circumstances that the sound and judicious lawyer, (Senator Lott,) who, as a senator expressed his concurrence in the judgment pronounced, laid the entire stress of his opinion. It cannot be denied, that in the elaborate opinion of Chancellor Walworth, there are many expressions which prove, if literally construed, that he meant to reject entirely the distinction between a transfer in payment or as a collateral security, as affecting the title of the holder of negotiable paper; but his remarks upon this point, if'meant to be thus understood, were extrajudicial, and are evidence only of his private opinion, and not of the grounds upon which the judgment of the court was placed. Hence, although the observations of the chancellor may be thought to have weakened in some degree the authority of the cases in the supreme comt which we have cited, they afford no warrant for saying that those cases have, been overruled, and, until a decision directly overruling them shall have been pronounced in the court of *227 appeals, we must continue to regard them as evidence of the law, which we are bound to follow.
ETor shall we dissemble our satisfaction that our inquiries have terminated in this result. It would have been a subject of just regret, had we been compelled to say that we have departed, in this state, from a general and undoubted rule of mercantile law. As the case now stands, the doctrine of the supreme court, to which we adhere, is in perfect harmony with the decisions in England, and in most, if not all, of our sister states. The distinction which Chancellor Walworth is supposed to have rejected, hás been admitted and followed in Ohio, Carlisle v. Wishart, 11 Ohio Report 172, Riley v. Anderson, 2 McLean 589; in Pennsylvania, Petrie v. Clark, 11 Sergeant and Rawle 377; in Connecticut, Brush v. Scrivener, 11 Connecticut 388; in Maine, Holmes v. Smith, 4 Shepley 177, Norton v. Waite, 2 Appleton 175; and in New Hampshire, Williams v. little, 1 N. Hampshire 66; and in this last case, Chief Justice Parker, with great clearness and force of reasoning, has vindicated its propriety and justice. We add that the validity of the distinction was very plainly admitted in Coddington v. Bay, not only by the chancellor in the court below, but by one or more of the judges of the supreme court in the court of errors; and that Chancellor Kent, in the last edition of his commentaries, has given to it thé sanction of his deliberate approval.
Although we believe and so decide, that the Springfield Bank, by surrendering, as paid, the draft of Howard & Lathrop, gave a valuable consideration for the note of the plaintiffs, it is not necessary, nor do we intend to place our decision solely upon this ground. We are satisfied that, independent of the discharge of a debt then due from Howard & Lathrop, the bank parted with value upon the faith of the title which it acquired to the note in controversy, and whether this value was parted with at the time the note was accepted, or at any subsequent period before notice of the claim of the plaintiffs, we hold to be immaterial. It is now impossible to restore the bank to the condition in which it was when the note was accepted. A decree, such as the plaintiffs would require, would cast upon the bank an inevitable loss, arising solely from a discount in the usual course of banking *228 business of negotiable paper, on account of those who upon the face of the paper were its absolute owners; and to such a loss a bank can never be subjected, without an entire abandonment of the rules by which the indorsers of negotiable paper have hitherto been protected. Before the transaction which has led to the present suit, the bank was in the practice of discounting the drafts of Howard & Lathrop, before they were transmitted for acceptance; but, to secm*e it against the unusual risk which was thus incurred, certain promissory notes belonging to Howard & Lathrop, admitted to be good, and amounting in the aggregate to nearly $1,000, had been delivered to the bank. When the note in controversy was discounted, the unaccepted drafts held by the bank, including that which was. then surrendered, amounted to something less than $6,000, so that the bank, at this time, had ample security for the payment of the draft, which, upon the faith of the note, was given up to the drawers. By the acceptance of the note this security was of necessity relinquished, for, by the terms of the agreement of the parties, it was only to unaccepted drafts that it could be applied. It is said, however, that the bank retained, and still retains, in its possession, the promissory notes that form this collateral security, and consequently that the avails may still be applied to the satisfaction of the original debt, which, should a decree be made in favor of the plaintiffs, will -certainly be revived. And this reply would perhaps be satisfactory, had it not appeared in evidence that, subsequent to the acceptance of the note in controversy, and long before any notice of the claim of the plaintiffs, other drafts of Howard & Lathrop were discounted by the bank, three of which, amounting in the aggregate to $4,150, still remain unaccepted and unpaid. To this sum must be added $2,650, the amount of two unaccepted and unpaid drafts previously discounted, and the result is that the collateral securities are completely exhausted by the debts, to the satisfaction of which, under the agreement of the parties, they are justly and exclusively applicable. The right of the bank to make this application under the terms of that agreement, cannot be disputed, nor is there any principle of law or equity that can justify us in preventing the exercise of this right. But we shall prevent its *229 exercise if we compel the bank to apply any portion of its collateral securities to the payment of the original debt, which the acceptance of the note of the plaintiffs was meant to extinguish. If we order that note to be surrendered or cancelled, the bank must lose the whole amount of the debt which it represents, solely from its reliance upon the note as a valid and independent security. It has been urged that there is no positive evidence that any of the subsequent drafts were discounted upon the faith of the note. But we are clearly of opinion that no further evidence of this fact was necessary to be given than was actually produced. It was sufficient to prove the general agreement that collateral securities were to be applied to unaccepted drafts, and we are bound to presume that every such draft was discounted in reliance upon this agreement, and it is a necessary consequence of this presumption that the note of the plaintiffs was held and considered by the bank as an independent security. •
The equity of the case, upon the facts that have been stated, is exceedingly clear. This suit is evidently a contest between two innocent parties—which shall sustain a loss resulting from the fraud of a third person, for that the act of Lathrop in transferring to the bank the note in controversy, in satisfaction of a debt due from his firm, was a fraud upon the plaintiffs, is not disputed. What, then, is the rule of law, and, we add, of reason and of equity, which is applicable to all such cases? It is that the loss shall be borne by the party-who employed and trusted the person from whose act or default .it proceeded. (Hazard v. Treadwell, 1 Strange 506; Fitzherbert v. Mather, 1 Term. R., p. 12; Barring v. Corrie, 2 Barn. & Ald. 143; Whitehead v. Tucker, 15 East 400; Smith v. East Ind. Co., 16 Sim. 76; Story on Agen., §§ 121, 264; Smith’s Mer. Law, p. 116.)
The plaintiffs employed and-trusted Lathrop—they placed their note in his hands as a business note—they authorized him to procúre it to be discounted as on account of his firm—they knew that he or his firm might misapply its proceeds when discounted ; they therefore took upon themselves the risk of such misapplication, and it would be palpably unjust to permit them to charge the bank with the consequences of a fraud which they *230 enabled Lathrop to commit, and the risk of which they chose to incur.
The bill must be dismissed, with costs.